# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BELIZE SOCIAL DEVELOPMENT )
LIMITED, )
       )
      Petitioner, )
       )
      v. )      **Civil Case No. 09-2170 (RJL)**
       )
THE GOVERNMENT OF BELIZE, )
       )
      Respondent. )

**FILED**

DEC 1 1 2013

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(December **11**, 2013) [##1, 15, 47]

Petitioner Belize Social Development Limited ("petitioner" or "BSDL") brings

this action against respondent the Government of Belize ("respondent" or "GOB"),

seeking the confirmation and enforcement of a foreign arbitral award pursuant to § 207 of

the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207, and Article III of the Convention

on the Recognition and Enforcement of Foreign Arbitral Awards ("New York

Convention" or "N.Y. Conv.").[1] Before the Court are petitioner's Petition to Confirm

Arbitration Award and to Enter Judgment [Dkt. #1] and respondent's Motion to Stay

Action or, in the Alternative, Dismiss Petition [Dkt. #15]. Upon consideration of the

pleadings, relevant law, and the entire record, the petition to confirm and enter judgment

is GRANTED, and the motion to stay or dismiss is DENIED.

---

[1] *Opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (entered into force
for the U.S. Dec. 29, 1970), *available at* http://treaties.un.org/doc/Treaties/1959/06/
19590607%2009-35%20PM/Ch_XXII_01p.pdf.

## FACTUAL BACKGROUND

### A.    Accommodation Agreements

On September 19, 2005, respondent GOB and Belize Telecommunications Limited ("BTL")[2] entered into the first of four "Government Telecommunications Accommodation Agreement[s] . . . to improve telecommunications for the people of Belize and better accommodate the GOB's telecommunications needs." Pet'r's Mem. of Points and Authorities in Supp. of Pet. to Confirm Arb. Award & Enter J. ("Pet'r's Mem.") at 2 [Dkt. #1-1]; Resp't's Mem. in Supp. of Mot. to Stay Action or, in the Alt., Dismiss Pet. ("Resp't's Mem.") at 5–6 [Dkt. #15]. As part of the agreements (hereinafter, "original agreements"), BTL would acquire certain properties owned by GOB for 19,200,000 Belize dollars. Pet'r's Mem. at 2. In exchange, GOB would give BTL preferential tax treatment, exempt BTL from import duties on goods and equipment, guarantee BTL a minimum rate of return on investments, pay any shortfall that may occur between the minimum rate of return and the actual rate of return, and allow BTL to control the use of "Voice Over Internet Protocol." *Id.*; *see also* Pet. to Confirm Arb. Award & Enter J., Ex. A ("Final Award" or "LCIA Award") at 20–23 [Dkt. #1-3] (explaining class license holders and their customers were not permitted to use voice over internet protocol services unless permitted by the individual license holder (BTL)).

---

[2] Belize Telecommunications Ltd. (now "Belize Telemedia Limited") is owned by Lord Michael Ashcroft, who is a member of the United Kingdom House of Lords and has dual nationality in Belize. Resp't's Prelim. Resp. to Pet. to Confirm Arb. Award ("Resp't's Prelim. Resp.") at 3 [Dkt. #16]. He is one of the wealthiest people in the United Kingdom and Belize and is a major investor in Belize. *Id.*

The Accommodation Agreements also contained a clause which provided that any dispute would be referred to and resolved by arbitration under the London Court of International Arbitration ("LCIA") Rules. Pet'r's Mem. at 4. Over the next few years, the parties amended the original agreement three times and on May 29, 2007, under the third agreement, Belize Telemedia Limited ("Telemedia") "assumed all of BTL's rights and obligations under the Accommodation Agreement." *Id.* at 3.

On February 8, 2008, Dean Barrow was appointed the new Prime Minister of Belize and his administration refused to acknowledge Telemedia's rights as set forth in the Accommodation Agreements or to comply with its obligations under the agreements. *Id.* at 5. Telemedia, on the other hand, complied with its obligations under the Accommodation Agreements by purchasing GOB properties for 19,200,000 Belize dollars. *Id.*

## B.    Arbitration Proceedings in the LCIA

Telemedia submitted a request for arbitration to the LCIA on May 9, 2008, claiming multiple breaches of the Accommodation Agreements. Pet'r's Mem. at 6. The LCIA appointed a Tribunal comprised of three distinguished arbitrators to govern the arbitration proceedings. *Id.* at 7. GOB refused to participate in the arbitration proceedings, *id.* at 8; Resp't's Prelim. Resp. at 6, and on March 18, 2009, following a three day evidentiary hearing, "the Tribunal unanimously ruled in favor of Telemedia and issued its Final Award," which granted Telemedia both declaratory and monetary relief, Pet'r's Mem. at 8; Resp't's Mem. at 8. The Tribunal found that: (i) the Accommodation Agreements are legal and binding under Belize law, (ii) "GOB . . . violated numerous

3

provisions of the Accommodation Agreement[s]," and (iii) "Telemedia was entitled to relief." Pet'r's Mem. at 9.

Two days after the Tribunal issued its Final Award, on March 20, 2009, BSDL was created in the British Virgin Islands. Resp't's Prelim. Resp. at 7. That same day, Telemedia assigned to BSDL the monetary portion of the Tribunal's Final Award, *id.* at 7–8, thereby allowing BSDL "to enforce and receive the monetary portion of the Final Award," Pet'r's Mem. at 9.

## C.    Belize Litigation and GOB Legislation

In Belize, GOB filed a lawsuit against Telemedia on April 6, 2009, Pet'r's Mem. in Opp'n to Resp't's Mot. to Stay or Dismiss and in Supp. of Pet. To Confirm Arb. Award ("Pet'r's Suppl. Mem.") at 3 [Dkt. #45], seeking a declaratory judgment that the Tribunal's arbitration award is "unenforceable and the Accommodation Agreements are invalid as contrary to Belize law and public policy," Resp't's Prelim Resp. at 8.[3] On July 20, 2009, the Belize Supreme Court issued a preliminary injunction barring Telemedia and BSDL from enforcing the arbitration award until after the court issued its ruling in the pending action. *Id.* at 9. The parties dispute whether that injunction remains valid after the April 2009 lawsuit was discontinued and a February 2012 lawsuit instituted in its place. *See* Resp't's Suppl. Br. at 3 [Dkt. #39] (claiming that "the injunction remains in

---

[3] The lawsuit was captioned *Attorney General v. Belize Telemedia Ltd. & Belize Social Development Ltd.*, Claim No. 317 of 2009. *See* Resp't's Mot. to Stay Action or, in the Alt., Dismiss Pet. ("Resp't's Mot.") at 1 [Dkt. #15].

place"); Pet'r's Suppl. Mem. at 4 (claiming that "the Belize Supreme Court ordered . . . the discharge of the injunction").[4]

GOB also enacted legislation in 2009 to assume control over telecommunications in Belize and obtained 94% of Telemedia's shares as part of that legislation. Resp't's Prelim. Resp. at 9; Resp't's Suppl. Br. at 12. In 2010, the Belize Supreme Court of Judicature (Amendment) Act ("SCJA") made it a criminal offense punishable by fine, imprisonment of at least five years, or both "to disobey or fail to comply with an injunction" issued by the Belize Supreme Court. Pet'r's Suppl. Mem. at 5. GOB also made it a crime for BSDL and its counsel to respond to the pleadings that GOB had already filed in this case. *Id.* In August 2012, "the Belize Court of Appeal struck down several sections of the SCJA as unconstitutional," including the sections giving SCJA extraterritorial effect[5] and the sections imposing criminal penalties. *Id.* at 6.

---

[4] GOB's April 2009 lawsuit was discontinued because "the Claim had not been served within the required period and had expired." Decl. of Eamon H. Courtenay ("Courtenay Decl."), Ex. B (Apr. 19, 2012 Order of the Belize Supreme Court) [Dkt. #45-8]; *see also* Courtenay Decl. ¶ 9 [Dkt. #45-6]. The Order discontinuing the case also explicitly discharged the injunction against BSDL. *Id.* Ex. B ¶ 3. In GOB's February 2012 suit— *Attorney General v. Belize Social Development Ltd.*, Claim No. 140 of 2012—the court entered an injunction, but it expired on March 29, 2012. *See* Courtenay Decl. ¶¶ 10–13 & Ex. C. ¶ 6. As of February 2013, that case was still pending before the Belize Supreme Court. *See id.* ¶ 15; Tr. of Oral Arg., Feb. 25, 2013 ("Tr.") at 45–46.

[5] The SCJA purported "to have extraterritorial effect, making it a criminal offense if any person, whether in Belize or elsewhere, directly or indirectly 'instigates, commands, counsels, procures, solicits, advises or in any manner whatsoever aids, facilitates or encourages' violation of an injunction or similar order issued by the Supreme Court of Belize." Pet.'s Suppl. Mem. at 5.

## D. United States Litigation

BSDL filed its petition in this Court on November 17, 2009. On October 18, 2010, this court stayed the proceeding pending resolution of the case in Belize. *Id.* at 7. BSDL appealed the stay order and, alternatively, sought a writ of mandamus. *Id.*

The United States Court of Appeals for the District of Columbia Circuit granted the writ of mandamus and held that this court's indefinite "stay order as issued exceeded the proper exercise of authority of the district court." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012), *cert denied*, 133 S. Ct. 274 (2012). In addition, the D.C. Circuit held that this case is governed by the New York Convention, and litigation in Belize is irrelevant to enforcement of the arbitration award in this proceeding. *See id.* at 730 ("[T]he pending action in Belize has no preclusive effect on the district court's disposition of the petition to enforce pursuant to the FAA and the New York Convention . . . ."). The case was remanded, and I was instructed to "conduct further proceedings not inconsistent with [the] opinion." *Id.* at 734 (internal quotation marks omitted).

## LEGAL ANALYSIS

At oral argument, BSDL took the position that "in the world of foreign arbitration awards that are brought to the United States for confirmation under 9 USC section 207, this is what you would call run of the mill," and that "the D.C. Circuit has given . . . a very clear template as to what is to be done, because section 207 says that when an award is brought for confirmation, the District Court shall confirm unless one of the grounds for

either stay or non-enforcement under the [New York] convention is established." Tr. at 20. This is in line with my reading of our Circuit Court's opinion in this case:

> [T]he FAA, by codifying the New York Convention, provides a carefully structured scheme for the enforcement of foreign arbitral awards and represents an "emphatic federal policy in favor of arbitral dispute resolution," which "applies with special force in the field of international commerce." The plain terms of the FAA instruct a district court reviewing a foreign arbitral award to "confirm the award unless it *finds* one of the grounds for refusal or deferral of recognition or enforcement . . . specified in the [New York] Convention."

*Belize Soc. Dev. Ltd.*, 668 F.3d at 733 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), and 9 U.S.C. § 207).[6]

GOB nevertheless argues that, even after the Circuit Court's ruling, there are at least five distinct grounds on which I could dismiss the petition, including lack of subject matter jurisdiction, lack of standing, and *forum non conveniens*. *See* Resp't's Suppl. Br. at 1–26; Resp't's Mem. at 15–45; Oral Arg. Tr. at 4–19. I am confident that if this case raised such significant jurisdictional and justiciability concerns, our Circuit Court would have flagged them, rather than emphasizing that "the district court's task [is] to review and grant BSDL's petition to confirm the Final Award absent a finding that an enumerated exception to enforcement specified in the New York Convention applie[s]." *Belize Soc. Dev. Ltd.*, 668 F.3d at 733. Still, in an abundance of caution, I will consider

---

[6] This case does not involve "a number of complex factual and legal issues" warranting dismissal. Resp't's Suppl. Br. at 12. Even if I accepted the notion that a petition can be denied solely because it is complex, I would not do so here. Indeed, the length of this opinion is a result of the sheer number of meritless arguments that GOB has raised, not their complexity!

each of GOB's grounds for dismissal before turning to GOB's five arguments for why I should deny the petition on its merits. *See* Resp't's Suppl. Br. at 26–43.

In short, I am not persuaded by any of GOB's asserted bases for dismissing or denying BSDL's petition, and I will therefore grant the petition, confirm the arbitration award, and enter judgment in BSDL's favor.

## I.    GROUNDS FOR DISMISSING THE PETITION

### A.    Jurisdiction and Immunity Under Foreign Sovereign Immunities Act

This Court has subject matter jurisdiction over "any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under [the Foreign Sovereign Immunities Act ("FSIA")] or under any applicable international agreement." 28 U.S.C. § 1330(a). GOB takes the position that it is entitled to sovereign immunity under the FSIA because it has never waived immunity and none of the FSIA exceptions apply. *See* Resp't's Mem. at 37–41. GOB is mistaken.

Under the FSIA, a foreign sovereign enjoys no immunity from a suit "to confirm an award made pursuant to [] an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6)(B). The LCIA's award in this case is clearly governed by the New York Convention because both England (where the arbitration took place) and the United States are parties to the Convention. *Belize Soc. Dev. Ltd.*, 668 F.3d at 731 n.3. Belize's status under the convention is irrelevant. *Id.* Moreover, it is well settled that an action to

8

confirm an arbitration award under the New York Convention falls squarely within the ambit of the § 1605(a)(6)(B) immunity exception. *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 123–24 (D.C. Cir. 1999); *see also Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 697 F. Supp. 2d 46, 55–56 (D.D.C. 2010) (applying 28 U.S.C. § 1605(a)(6) in case involving dispute between a foreign sovereign, Nigeria, and one of its own nationals, a Nigerian corporation). Thus, this Court has subject matter jurisdiction.[7]

GOB challenges the application of § 1605(a)(6), claiming that the LCIA's final arbitral award is unenforceable because the Accommodation Agreements containing the arbitration clause "are void *ab initio* under Belizean law." *See* Resp't's Suppl. Br. at 25; *see also* Final Award ¶ 17 (quoting relevant arbitration clause). I agree with my colleague, Judge Boasberg, who recently noted a lack of authority for the proposition "that the Court must conduct [] an independent, *de novo* determination of the arbitrability of a dispute to satisfy the FSIA's arbitration exception." *Chevron Corp. v. Republic of Equador*, --- F. Supp. 2d ----, 2013 WL 2449172, at *3 (D.D.C. June 6, 2013). Indeed, the FSIA jurisdictional inquiry is a "cabined" one that focuses on the authority of the

---

[7] Any argument that this Court lacks personal jurisdiction over GOB is also meritless. *See* Resp't's Mem. at 41–43. "[U]nder the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction." *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) (internal quotation marks omitted); *see also* 28 U.S.C. § 1330(b); *cf. GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012) ("[F]oreign sovereigns and their extensively-controlled instrumentalities are not 'persons' under the Fifth Amendment's Due Process Clause—and thus have no right to assert a personal jurisdiction defense." (citing *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95–96 (D.C. Cir. 2002))). GOB does not dispute that it was served process. *See* Oral Arg. Tr. at 23 (unrefuted argument by BSDL that "[t]here is no dispute about service.").

9

court, not the contractual rights and obligations of the parties. *See id.* at *4 (citing *Creighton Ltd.*, 181 F.3d at 24). And regardless of whether I consider contract validity now, the question will be addressed anyway—as it always is, though under a deferential standard, *see id.* at *5—when I turn to the Article V(1)(a) exception to the New York Convention, *see infra* Part II.B.[8]

## B.   *Forum Non Conveniens*

GOB also argues for dismissal based on the relative inconvenience of litigating in this forum. *See* Resp't's Mem. at 26–28; Resp't's Suppl. Br. at 5–13. Under the doctrine of *forum non conveniens*, I "must decide (1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981)). The balancing of private and public interests occurs *only if* an adequate alternative forum exists. *Id.*

Unfortunately for GOB, there is no adequate alternative forum for this case because "only a court of the United States (or of one of them) may attach the commercial property of a foreign nation located in the United States." *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005). Even if GOB has no attachable property in the United States at this time, Resp't's Suppl. Br. at 8, "it may own

---

[8] GOB also argues that the assignment between Telemedia and BSDL is void, so GOB remains immune to suits *brought by BSDL*. *See* Resp't's Suppl. Br. at 25–26. But GOB cites no case—and I am aware of none—in which a foreign state's amenability to suit under the FSIA turns on the validity of an assignment to the plaintiff.

10

property here in the future, and [BSDL's] having a judgment in hand will expedite the process of attachment," *TMR Energy*, 411 F.3d at 303. This is the controlling law in our Circuit, and I will therefore apply it faithfully.[9] Because GOB's *forum non conveniens* argument falters at the first step, I need not consider the second.

## C. International Comity and Abstention

Convenience aside, GOB also urges me to dismiss BSDL's petition on international comity and abstention grounds for the following reasons: Belize is not a signatory to the New York Convention, this matter is already before the courts of Belize, Belize has a greater interest in the outcome of the case, and there are conflicts of law between the United States and Belize. *See* Resp't's Mem. at 24–26; Resp't's Suppl. Br. at 13–19. The Circuit Court's decision remanding this case essentially forecloses these arguments, as the Court held that litigation in Belize "has no preclusive effect on the district court's disposition of the petition to enforce," *Belize Soc. Dev. Ltd.*, 668 F.3d at 730, and "[t]he fact that Belize is not a party to the New York Convention is irrelevant," *id.* at 731 n.3. Our Circuit Court, of course, was well aware that courts in Belize were reaching conflicting decisions regarding the enforceability of the Final Award, *see id.* at

---

[9] *TMR Energy* is binding, unlike Second Circuit case law, *see* Resp't's Mem. at 26–28 (citing *In re Arbitration Between Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488 (2d Cir. 2002)); Resp't's Suppl. Br. at 6–10 (citing *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384 (2d Cir. 2011)), and unlike an "in the alternative" decision rendered by another judge of this court that was not affirmed (or even considered) on appeal, Resp't's Mem. at 28 (citing *TermoRio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*, 421 F. Supp. 2d 87 (D.D.C. 2006), *aff'd on other grounds*, 487 F.3d 928, 932 (D.C. Cir. 2007).

728–29, and it instructed me to proceed with enforcement anyway.[10] Regardless of whether our Circuit Court's "holding has the potential for straining relations between the United States and Belize," Resp't's Suppl. Br. at 17, I am, in the final analysis, bound by that decision.[11]

### D. Standing

According to GOB, BSDL lacks standing to enforce the arbitration award because Telemedia did not validly assign BSDL the right to the monetary portion of the award. GOB challenges the assignment both under the terms of the Accommodation Agreement, *see* Resp't's Mem. at 33–34; Resp't's Prelim. Resp. at 16–17; Resp't's Suppl. Br. at 20–

---

[10] I am also not convinced that there really is a "true conflict" between U.S. and Belizean law. *See* Resp't's Suppl. Br. at 18–19. The Court of Appeal of Belize has held that, because Belize is not party to the New York Convention, "there is no legal obligation *on the part of Belize* to recognize and enforce domestically arbitral awards within the contemplation of the New York Convention in accordance with Article 3 of that instrument." Decl. of Michael C. Young, S.C. ("Young Decl."), Ex. K at ¶ 76 (*Att'y Gen. of Belize v. BCB Holdings Ltd.*, Civ. App. No. 4 of 2011 (Aug. 8, 2012)) [Dkt. #39-12] (emphasis added). Our Circuit Court has, to my knowledge, never addressed whether *Belize's courts* must enforce awards under the New York Convention; it has merely held that *this Court* is required to do so unless a Convention exception applies. *See Belize Soc. Dev. Ltd.*, 668 F.3d at 733.

[11] GOB ignores that "the central precept of comity teaches that, *when possible, the decisions of foreign tribunals should be given effect in domestic courts,* since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) (emphasis added). The LCIA—located in England, a fellow signatory to the New York Convention—rendered a decision in BSDL's favor, and I will not dismiss this enforcement petition on the backwards notion that doing so will somehow advance the courts' interest in fostering international cooperation and reciprocity with foreign governments and their legal tribunals.

21, and under Belizean law, *see* Resp't's Suppl. Br. at 21–22 (citing Belizean case law and regulations).[12] Neither of these arguments is persuasive.

First, Section 19 of the Accommodation Agreement, on which GOB bases its entire Accommodation Agreement argument, was "deleted in its entirety" and replaced by a new provision on January 1, 2008, more than a year before the March 20, 2009 Telemedia-BSDL assignment even took place. *See* Decl. of Louis B. Kimmelman ("Kimmelman Decl."), Ex. E ¶¶ 7.2, 7.3 (Settlement Deed dated Jan. 7, 2008) [Dkt. #1-7], *amending* Kimmelman Decl., Ex. B § 19 ("Accommodation Agreement") [Dkt. #1-4]. Paragraph 7.3 of the Settlement Deed, which was in effect at the relevant time, contains *none* of the terms in Section 19 that GOB claims were offended by the assignment.

Second, GOB's reliance on the law of Belize is misplaced. By its own terms, the assignment "is governed by English law and shall be construed in accordance with English law." *See* Decl. of Stephen J. Ruzika ("Ruzika Decl."), Ex. C ¶ 3.6 (Deed of Assignment) [Dkt. #1-19].[13] Curiously, GOB does not address English law at all in its briefs, whereas BSDL has provided a thorough expert opinion, which explains that the

---

[12] GOB does not dispute that under the New York Convention, an assignee can enforce an arbitration award in favor of the assignor. *See, e.g.*, *Global Distressed Alpha Fund I LP v. Red Sea Flour Mills Co. Ltd.*, 725 F. Supp. 2d 198 (D.D.C. 2010).

[13] Precedent from this Circuit and others favors application of the law that the parties to a contract agreed would apply. *See, e.g.*, *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 411 n.11 (2d Cir. 2009) (in action to enforce arbitration award under New York Convention, applying New York law pursuant to choice-of-law clause in agreement); *Asia N. Am. Eastbound Rate Agreement v. BJI Indus., Inc.*, 923 F. Supp. 4, 4 (D.D.C. 1996) (applying Hong Kong law in arbitration enforcement case because "'[u]nder American law, contractual choice-of-law provisions are usually honored.'" (quoting *Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763, 767 (D.C. Cir. 1992))).

assignment "complies with the requirements of section 136 of the [English] Law of Property Act 1925" and "is sufficient to transfer the [monetary portion of the arbitration award] from Telemedia to BSDL pursuant to both section 136 and equity." Op. of Marcus Smith QC on English Law ("Smith Op.") ¶ 15 [Dkt. #45-16]; *see also id.* ¶¶ 10–14. Moreover, BSDL's expert details why "nothing in either section 19 [of the Accommodation Agreement] or in section 7.3 [of the Settlement Deed] . . . prevent[s] the assignment." *Id.* ¶ 9; *see also id.* at 6–8. Finding no basis to discredit BSDL's expert or to treat the assignment as invalid, I am satisfied that BSDL has standing.[14]

### E. Failure to Join a Required Party Under Rule 19

I am also satisfied that there are no necessary parties missing from this case. Under Federal Rule of Civil Procedure 19, a case may be dismissed only if an absent party is "required" in the litigation, the absent party cannot be joined, and equitable factors weigh in favor of dismissal. *Cherokee Nation of Okla. v. Babbitt*, 117 F.3d 1489, 1495–96 (D.C. Cir. 1997) (citing FED. R. CIV. P. 19(a), (b)); *see also* FED. R. CIV. P. 12(b)(7) (allowing motion to dismiss for "failure to join a party under Rule 19"). A party is "required" if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

---

[14] As already explained, it is irrelevant that "BTL intends to file an action in the Belize Supreme Court seeking a declaration that the purported assignment between [Telemedia] and BSDL was void *ab initio*." Resp't's Suppl. Br. at 23; *see Belize Soc. Dev. Ltd.*, 668 F.3d at 730.

> (i) as a practical matter impair or impede the person's
> ability to protect the interest; or
>
> (ii) leave an existing party subject to a substantial risk
> of incurring double, multiple, or otherwise inconsistent
> obligations because of the interest.

FED. R. CIV. P. 19(a)(1).

GOB contends that Telemedia and its former majority shareholder, Dunkeld International Investments Ltd. ("Dunkeld"), are indispensable parties because Dunkeld has brought a separate claim in Belize "assert[ing] damages from the non-payment of the same Arbitration Award that BSDL seeks to collect," Resp't's Mem. at 44; *see also id.* at 43–45; Resp't's Suppl. Br. at 23–25, and because Telemedia "is the beneficiary of the award on its face and . . . the purported assignment [from Telemedia to BSDL] was invalid," Resp't's Suppl. Br. at 24. These arguments are meritless.

There is no evidence in the record that Dunkeld has ever asserted the right to enforce the LCIA arbitration award. To the contrary, Dunkeld's December 4, 2009 Notice of Arbitration—which GOB cites as the sole piece of evidence that Dunkeld has claimed an interest in the award—explicitly states that "[o]n 20 March 2009 Telemedia assigned the benefit of the LCIA Award . . . insofar as it orders the payment of certain damages and costs by [GOB] to Telemedia, to [BSDL]." Decl. of Gian C. Ghandi ("Ghandi Decl."), Ex. 8 ¶ 7.13 (Notice of Arbitration) [Dkt. #15-10]. And as already discussed, Telemedia in fact *did* assign to BSDL its right to the monetary portion of the arbitral award, as well as the right to enforce that award. *See supra* Part I.D; *see also* Ruzika Decl., Ex. C ¶ 1.3 ("[T]he Assignee shall have the sole right to enforce any and

all rights which accrue in respect of the [damages and costs awarded by the LCIA] against [GOB].""). Dunkeld obviously agrees that there is a valid assignment.[15]

As a matter of both English and U.S. law, not to mention common sense, an absent party that has assigned its legal rights is not "required" in litigation brought by the assignee to enforce those rights. *See* Smith Op. ¶ 11 ("BSDL can claim the [award] in its own name . . . ."); *Primax Recoveries, Inc. v. Lee*, 260 F. Supp. 2d 43, 51 (D.D.C. 2003) ("In light of [an assignee-]plaintiff's claim that it is the sole possessor of the rights being asserted against defendant, it is difficult to see how the Court will be unable to accord relief in the absence of [an assignor] or how defendant will incur multiple or inconsistent obligations by reasons of the claimed interest.").[16] Conversely, an attempt by Telemedia or its former shareholder to enforce rights that it has assigned away would be patently

---

[15] Paragraph 7.33 of the Dunkeld-GOB Notice of Arbitration does not support GOB's argument that Dunkheld has asserted damages from the non-payment of the arbitration award. *See* Resp't's Mem. at 43–44. Rather, it appears to reflect a disagreement about whether GOB is entitled to deduct "sums allegedly due as arrears of taxes, duties and charges" when compensating Dunkeld for its shares in Telemedia and whether "the specified taxation rates and set-off provisions of the Accommodation Agreement" apply. Gandhi Decl., Ex. 8 ¶ 7.33. It says nothing about Dunkeld's or Telemedia's right to enforce the LCIA award itself.

GOB also grossly mischaracterizes the record when it says that "In [a December 2009] letter, as a basis of its threatened claims against the GOB, Dunkeld asserts that the GOB 'has not complied with [the subject] LCIA award." Resp't's Suppl. Br. at 23. The quoted statement about GOB's non-compliance with the award is not in the letter from Dunkeld's counsel, *see* Ghandi Decl., Ex. 8 at 3–4, but rather is found ten pages into Notice of Arbitration, which was attached to the letter, *see id.* ¶ 7.14. Moreover, it is found in the "factual background to the dispute" section of the Notice, *see id.* ¶ 7, and is not at all presented as "a basis of [Dunkeld's] threatened claims."

[16] *Cf. Capitol Med. Ctr. v. Amerigroup Md., Inc.*, 677 F. Supp. 2d 188, 193 n.7 (D.D.C. 2010) ("Unlike the plaintiff in [*Primax*], [plaintiff] has not assumed the rights of the absent party.").

frivolous under English law (which, again, governs the assignment agreement) unless BSDL were joined as a party in *that* case. *See* Smith Op., Ex. K ¶ 58 ("When there has been an assignment that takes effect in equity, the general rule is that *it is the equitable assignee who has the right to sue*, because it is the equitable assignee who is beneficially entitled to the thing in action. *The assignor will not be allowed to maintain an action regarding the thing in action unless the assignee is joined as a party to the claim*." (emphases added)). GOB offers no evidence that BSDL has ever signaled a willingness to assist Telemedia or Dunkeld in bringing duplicitous lawsuits to enforce the arbitration award. Telemedia and Dunkeld therefore have no "legally protected interest" worthy of recognition under Rule 19(a)(1)(B). *See Wach v. Byrne, Goldenberg & Hamilton, PLLC*, 910 F. Supp. 2d 162, 170 (D.D.C. 2012) ("legally protected interest" excludes claims that are "patently frivolous" (quoting *Davis v. United States*, 192 F.3d 951, 959 (10th Cir. 1999); citing *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992))).

## II.     GROUNDS FOR DENYING THE PETITION[17]

### A.     Failure to Produce Copies of Arbitral Award and Accommodation Agreement (Article IV(1))

GOB claims that BSDL's petition should be denied because it does not comply with Article IV of the New York Convention, which requires the petitioner, "at the time

---

[17] I note that under the New York Convention, "[r]ecognition and enforcement of the award *may* [not must] be refused . . . only if" the opposing party proves that certain conditions are met. Art. V(1) (emphasis added). As I will explain at length, I find that none of those conditions are met; however, even if I am mistaken, I would still exercise any discretion that I have to recognize and enforce the award in BSDL's favor, as I believe that is consistent with our federal treaty obligations and policies favoring arbitral dispute resolution, deference to arbitrators, and comity with fellow treaty signatories.

of the application, [to] supply: (a) The duly authenticated original award or a duly certified copy thereof; [and] (b) The original agreement [to arbitrate] or a duly certified copy thereof." Resp't's Suppl. Br. at 27 (quoting Article IV(1)). BSDL concedes that it did not provide original or duly certified copies of original documents, but says that "signed copies . . . that were certified to be 'true and correct' copies 'under penalty of perjury'" are enough. Pet'r's Suppl. Mem. at 17–18 (citing Dkt. ##1-3, 1-4).

I agree with another judge who characterized an argument like GOB's as "grasping at straws, attempting to persuade the Court to refuse to confirm the award on the basis of a mere technicality." *Arbitration Between Overseas Cosmos, Inc. v. NR Vessel Corp.*, No. 97 CIV. 5898(DC), 1997 WL 757041, at *5 (S.D.N.Y. Dec. 8, 1997).[18] The purpose of Article IV's "original . . . or duly certified copy" requirement is to require the petitioner to prove that the relevant documents exist. *See id.* Like the respondent in *Overseas Cosmos*, GOB challenges only the enforceability—not the *existence* or *genuineness*—of the arbitration agreement or award;[19] therefore, sworn and certified copies of these documents are "sufficient to satisfy the requirements of Article IV." *Id.*; *see also Cont'l Grain Co. v. Foremost Farms Inc.*, No. 97 Civ. 0848 (DC), 1998 WL

---

[18] In many, if not most, arbitration-confirmation cases, the respondent does not even raise an Article IV argument, and my colleagues routinely confirm arbitral awards relying on documents sworn and certified by petitioner's counsel. *See, e.g., Chevron Corp.*, 2013 WL 2449172 at *6; *id.*, CA No. 12-1247 (JEB), Decl. of Edward G. Kehoe & Exs. 1–5 [Dkt. ##4 to 4-5]; *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 31 (D.D.C. 2011); *id.*, CA No. 09-791 (RBW), Decl. of Christopher R. Hart & Exs. A, B [Dkt. ##1-2, 1-4].

[19] Petitioner's counsel presented originals at the February 25, 2013 oral argument, *see* Tr. at 20, and respondent did not dispute their existence or authenticity.

132805, at *2 (S.D.N.Y. Mar. 23, 1998). Under these circumstances, reading Article IV to require anything more would create a rule that is "unnecessarily restrictive and at odds with a common sense reading of the provision." *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 934 (2d Cir. 1983).[20]

## B.     Invalidity of Accommodation Agreement (Article V(1)(a))

Next, GOB argues that the arbitration award is unenforceable because "the alleged arbitration agreement [between GOB and BTL] is invalid under the laws of Belize." *See* Resp't's Suppl. Br. at 28 (citing N.Y. Conv. Art. V(1)(a)). In truth, however, GOB does not challenge the legality of the *arbitration agreement* as a stand-alone provision; rather, GOB fires attacks on at least a dozen *other* provisions of the Accommodation Agreements. *See id.* at 28–38; Resp't's Prelim. Resp. at 26–36.

Unfortunately for GOB, it is well-settled law that "an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) (holding that arbitrator should decide whether contract containing arbitration clause was void *ab initio* because terms other than the arbitration clause violated state law and rendered the contract "criminal on its face"). Absent a direct challenge to the arbitration clause itself, the clause remains "enforceable apart from the remainder of the contract," and GOB's challenge to the validity of the contracts "should . . . be considered by an arbitrator, not a court." *Id.* 446; *see also id.* at

---

[20] This case is unlike *Czarina, L.L.C. v. W.F. Poe Syndicate*, where the court held that an "unsigned, unexecuted sample wording" of an arbitration clause was not sufficient. 358 F.3d 1286, 1289 (11th Cir. 2004). BSDL's copies of the arbitration agreement and award are signed, executed, and in final form. *See* Accommodation Agreement at 25; Final Award at 109.

449 ("*[A] challenge to the validity of the contract as a whole*, and not specifically to the

arbitration clause, *must go to the arbitrator.*" (emphases added)); *Nanosolutions, LLC v.*

*Prajza*, 793 F. Supp. 2d 46, 54–55 (D.D.C. 2011) ("[T]he FAA prohibits a district court

from considering . . . challenges [to] the contract as a whole.").[21]  Moreover, the New

York Convention instructs contracting states to "recognize an agreement in writing under

which the parties undertake to submit to arbitration," with "agreement in writing" defined

to include "an arbitral clause *in a contract.*" N.Y. Conv. Art. II(1), (2) (emphasis added).

Thus, the "agreement in writing" that must be valid under the convention is the

arbitration clause, *not* the entire contract containing the clause.

Section 15.2 of the Accommodation Agreement reflects the parties' clear intent to

arbitrate "[a]ny dispute arising out of or in connection with this Agreement including any

question regarding its existence, validity or termination."  GOB offers no basis under

Belizean law, or any other law, for this Court to find *that particular clause* invalid.[22]

---

[21] The LCIA considered the validity of the Accommodation Agreement, *see* Final Award ¶¶ 146–176, and found it "valid and enforceable against the present [GOB]," *id.* ¶ 176.

[22] GOB relies heavily on the Third Circuit's opinion in *China Minmetals Materials Import & Export Co., Ltd. v. Chi Mei Corp.*, but in that case, the respondent claimed that the entire agreement containing the arbitration clause had been forged and thus the parties had never agreed to arbitrate, 334 F.3d 274, 277 (3d Cir. 2003).  The court framed the question before it as "whether a foreign arbitration award might be enforceable regardless of the validity *of the arbitration clause* on which the foreign body rested its jurisdiction." *Id.* at 279 (emphasis added).  Answering in the negative, the court held "that a district court should refuse to enforce an arbitration award under the Convention where the parties did not reach a valid agreement *to arbitrate.*" *Id.* at 286 (emphasis added); *see also id.* at 284 ("[T]he district court here had an obligation to determine independently the existence of an agreement *to arbitrate . . . .*" (emphasis added)).
    Given the particular facts before the court, I read *China Minmetals* as consistent with *Buckeye*, which distinguished between "[t]he issue of the contract's validity," which

## C. The Inappropriateness of Arbitration (Articles V(1)(c) and V(2)(a))

The New York Convention allows for enforcement of an arbitral award to be refused if "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration," Art. V(1)(c), or if "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of th[e] country" being asked to recognize and enforce the award, Art. V(2)(a). GOB contends that these articles apply because the LCIA Award and its enforcement violate the internationally-recognized common law revenue rule, *see* Resp't's Mem. at 19–24; Resp't's Prelim. Resp. at 12–16, 36–38; Resp't's Suppl. Br. at 38–40, as well as the United States' political question and act of state doctrines and principles of comity,[23] *see* Resp't's Prelim. Resp. at 38–39; Resp't's Suppl. Br. at 40. According to GOB, U.S. courts cannot resolve disputes like the one between GOB and Telemedia, so an arbitrator in the United States could not settle such a case either. *See* Resp't's Suppl. Br. at 40.[24]

---

is *not* for the court to resolve, and "the issue [of] whether any agreement between the alleged obligor and obligee was ever concluded," which the courts might be allowed to consider. *Buckeye*, 546 U.S. at 444 n.1. In this case, GOB alleges that "[t]he illegality of provisions in the Accommodation Agreement is wide and major," Young Decl. at ¶ 7 [Dkt. #39-1], but unlike the respondent in *China Minmetals*, GOB does not challenge the very existence of an agreement to arbitrate between two parties who had the authority and capacity to contract on behalf of their principals, *see Buckeye*, 546 U.S. at 444 n.1.

[23] I have already discussed comity in an earlier section. *See supra* Part I.C.

[24] It bears noting that GOB is incorrect when it says that "an arbitrator operating under U.S. law cannot have any authority that is broader than a U.S. court would have." Resp't's Suppl. Br. at 40. At least one court has explicitly found that "[a] 'parochial

The LCIA considered the revenue rule and decided that it did not apply because this is a contract case, not an action to enforce a foreign nation's tax laws. *See* Final Award ¶ 180.[25] I agree with its reasoning. "[T]he revenue rule is often stated as prohibiting the *collection of foreign tax claims.*" *Pasquantino v. United States*, 544 U.S. 349, 361 (2005) (emphasis added) (holding that revenue rule did not preclude wire fraud prosecution of defendants who had engaged in smuggling to evade Canadian taxes). It is clear from the Supreme Court's analysis in *Pasquantino* that the rule long ago derived from "the rule against foreign penal enforcement" and the "analogy between foreign revenue laws and penal laws." *Id.* In bringing the LCIA arbitration and this enforcement action, Telemedia and BSDL are not attempting to enforce Belizean tax law or collect any tax revenue. They are seeking to enforce a *contract*, and although that contract contains tax-related provisions, the arbitration award and enforcement of that award do not entail the enforcement of any foreign revenue law. Thus, the matters arbitrated were contemplated by and within the terms and scope of the submission to arbitration, and they

---

refusal' to enforce an arbitration agreement would frustrate th[e] purpose [of the New York Convention], therefore, a court *should compel arbitration even if the arbitrator could make a ruling that an American court could not.*" *Belship Navigation, Inc. v. Sealift, Inc.*, 95 CIV. 2748 (RPP), 1995 WL 447656, at *6 (S.D.N.Y. 1995) (emphasis added) (quoting and citing *Mitsubishi Motors Corp.*, 473 U.S. at 629–31). In any event, for the reasons that follow, the subject matter of this case could be heard in U.S. courts.

[25] GOB characterizes the LCIA's discussion of the revenue rule as "one short paragraph" that relies on "unidentified" authorities. Resp't's Mem. at 22. To the contrary, paragraph 180 of the award is one of the longest in the Final Award, and footnote 95 provides ample support for the proposition that arbitrators can resolve tax issues in contract disputes.

relate to subject matter capable of settlement by arbitration in the United States. The revenue rule provides no basis for declining enforcement.[26]

As for the act of state doctrine, the FAA states that "[e]nforcement of arbitral agreements, confirmation of arbitral awards, and execution upon judgments based on orders confirming such awards *shall not be refused on the basis of the Act of State doctrine*." 9 U.S.C. § 15 (emphasis added).[27] Given that § 15 "eliminat[ed] the Act of State doctrine as a bar to arbitration," *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 272 (1995), it would be nonsensical for me to find that this case was "not capable of settlement by arbitration" in the United States because of that very doctrine.

The political question doctrine, meanwhile, "is primarily a function of the separation of powers" and *should not* be understood to mean that "every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 210–11 (1962). The subject matter of the controversy in this case—the existence and enforceability of a contract between a state and a private party—raises no separation of powers concerns, or any other political questions for that matter, that

---

[26] GOB does not cite a single case in which a U.S. court declines to enforce a foreign arbitral award based on the revenue rule.

[27] "Although [9 U.S.C. § 15] is located in Chapter One of the FAA rather than in the Convention-implementing Chapters Two and Three, Chapter One of the FAA applies to actions brought under the New York . . . Convention[] unless it is 'in conflict' with Chapter[] Two . . . [of] the Convention[] as ratified." *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 366 (S.D.N.Y. 2005) (quoting 9 U.S.C. § 208), *abrogation on other grounds recognized by Goel v. Ramachandran*, 823 F. Supp. 2d 206, 215–16 (S.D.N.Y. 2011). Section 15 does not appear to conflict with the New York Convention or Chapter Two of the FAA, *see id.*, and GOB offers no argument that such a conflict exists.

would make it non-arbitrable under U.S. law. In fact, courts in our Circuit regularly resolve contract disputes brought by private parties against foreign countries. *See McKesson, Corp. v. Islamic Republic of Iran*, 672 F.3d 1066 (D.C. Cir. 2012); *Gulf Res. Am., Inc. v. Republic of Congo*, 370 F.3d 65 (D.C. Cir. 2004); *El-Hadad v. United Arab Emirates*, 216 F.3d 29 (D.C. Cir. 2000); *Wye Oak Tech., Inc. v. Republic of Iraq*, --- F. Supp. 2d ----, 2013 WL 1734436 (D.D.C. Apr. 23, 2013). Given the frequency with which these cases arise—and the fact that GOB fails to cite even one such case decided on political question grounds—it simply cannot be that the political question doctrine bars U.S. courts from deciding any case in which a foreign government says that it breached a contract or committed a tort for some political reason. That defense could apply in *every* case of this sort, and yet, GOB cannot direct me to a single example of a court accepting it.

Furthermore, GOB cannot challenge enforcement by first, raising arguments that "depart from the law and enter the realm of political theory," and then, invoking the political question doctrine. *Republic of Philippines v. Westinghouse Elec. Corp.*, 774 F. Supp. 1438, 1465 (D.N.J. 1991).[28] This case implicates no "political decisions that are by their nature committed to the political branches to the exclusion of the judiciary," *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) (internal quotation marks

---

[28] *See id.* at 1464–65 (denying motion to dismiss on political-question grounds where defendant argued that former president's "*de facto* power negated the very existence of [all relevant] laws," because such an argument "has no place in a court of law"). GOB admits that its arguments are not legal in nature, *see* Resp't's Mem. at 32 ("[Resolving this petition] is not merely a task of applying a foreign law."), but rather are "part of a significant political controversy within Belize," *id.* at 30. A political controversy in Belize, however, does not necessarily create a "political question" in the United States.

omitted), nor any "separation-of-powers concerns that would justify invocation of the political question doctrine," *de Csepel v. Republic of Hungary*, 714 F.3d 591, 604 (D.C. Cir. 2013) (internal quotation marks omitted) (holding that political question doctrine did not bar suit by heirs of Jewish Hungarian art collector against Hungary for breach of bailment agreements entered during World War II).[29]

### E.  Suspension of the Award by a Competent Authority (Article V(1)(e))

In its initial motion to stay or dismiss and its preliminary response to BSDL's petition, GOB argued that I should decline to enforce the LCIA Award under Article V(1)(e) of the New York Convention because "enforcement of the Award has been suspended by a competent authority (Belize Supreme Court)." Resp't's Mem. at 15; Resp't's Prelim. Resp. at 20–26. Our Circuit Court addressed Article V(1)(e), saying:

> Because the arbitration occurred in London and under the arbitral laws of England, *the courts of England are the competent authority* with primary jurisdiction over the Final Award; absent proceedings for setting aside or suspending the Final Award *in those courts*, the [GOB] can offer no basis on which to conclude that the stay of BSDL's petition for enforcement was properly issued under the FAA and New York Convention.

*Belize Soc. Dev. Ltd.*, 668 F.3d at 731 (emphases added). GOB has not sought or obtained any relief in the English courts, so Article V(1)(e) does not apply.

---

[29] In its first filing, GOB raised the act of state and political question doctrines as grounds for dismissing the case outright, rather than denying the petition under Article V(2)(a). *See* Resp't's Mem. at 28–33. I reach the same outcome either way. This enforcement action raises no greater act-of-state or political-question concerns than the underlying arbitration does.

## F.    Public Policy (Article V(2)(b))

Finally, GOB urges the Court to refuse recognition and enforcement of the LCIA

Award on the basis that doing otherwise would be "contrary to the public policy" of the

United States.  Resp't's Prelim. Resp. at 39–42; Resp't's Suppl. Br. at 41–43 (quoting

N.Y. Conv. Art. V(2)(b)).  As our Circuit Court has noted, courts around the country

"have been very careful not to stretch the compass of 'public policy,'" applying the

defense "'only where enforcement would violate the forum state's most basic notions of

morality and justice.'"  *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C.

Cir. 2007) (quoting *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan

Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004)).

GOB cites the Foreign Corrupt Practices Act as the "best evidence[]" that the

United States has "a strong public policy against corruption abroad."  Resp't's Suppl. Br.

41.  I agree with the general notion that the United States has a strong policy against

foreign corruption.  But it also has a countervailing policy that I mentioned earlier—an

"'emphatic federal policy in favor of arbitral dispute resolution'" that "'applies with

special force in the field of international commerce.'"  *Belize Soc. Dev. Ltd.*, 668 F.3d at

733 (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 631).  This is not the first time a court

has been confronted with conflicting policies, one weighing in favor of enforcing an

arbitral award and one weighing against it, and consistently, U.S. courts have enforced

arbitral awards in the face of public policy interests *at least* as weighty as the policy

against corruption abroad.  *See Agility Pub. Warehousing Co. K.S.C., Prof'l Contract

Admins., Inc. v. Supreme Foodservice GmbH*, 495 F. App'x 149, 151 (2d Cir. 2012)

26

("[T]he [public policy] defense is frequently invoked but rarely successful, particularly in view of the strong United States policy favoring arbitration.").[30]  Accordingly, GOB has failed to show that, on balance, enforcing this award would so offend the United States' "most basic notions of morality and justice" that Article V(2)(b) applies.[31]

## III.   AWARD

It is "the norm" for courts enforcing arbitral awards to convert foreign currency amounts into dollars, *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, --- F. Supp. 2d ----, 2013 WL 1201380, at *2 (D.D.C. Mar. 26, 2013), and I will follow that norm.  In addition, I will exercise my discretion to award prejudgment interest because I find that doing so is "'consistent with the underlying arbitration award,'" which "grants pre-award interest but is 'silent' on whether a party should recover post-award interest—*i.e.*, prejudgment interest." *Id.* at *8 (quoting *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran*, 665 F.3d at 1103).  The prejudgment interest will be calculated using the average daily prime rate between the date of the Final Award and

---

[30] *See also, e.g.*, *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys.*, 665 F.3d 1091, 1096–100 (9th Cir. 2011) (regulating trade with Iran); *Steel Corp. of Philippines v. Int'l Steel Servs., Inc.*, 354 F. App'x 689, 694–95 (3d Cir. 2009) (preventing forum shopping); *Belship Navigation, Inc.*, 1995 WL 447656, at *6 (embargoing Cuba); *Nat'l Oil Corp. v. Libyan Sun Oil Co.*, 733 F. Supp. 800, 819–20 (D. Del. 1990) (cutting off funding to Libya); *Brandeis Intsel Ltd. v. Calabrian Chems. Corp.*, 656 F. Supp. 160, 165 (S.D.N.Y. 1987) (remedying arbitrator's "manifest disregard" for law).

[31] For reasons set forth in this Part and in Part II.B. ("Invalidity of Accommodation Agreement"), I find that additional briefing on a recent decision by the Caribbean Court of Justice is unnecessary, as that court's ruling would have no impact on my analysis.  I therefore will DENY GOB's Motion for Leave to Submit Additional Briefing [Dkt. #47].

the date of this opinion. *Id.* at 9.[32] Because the parties have not done so already, I will direct them to submit proposed judgment amounts with all conversions and interest calculations performed consistent with this opinion.

## CONCLUSION

For all the foregoing reasons, petitioner's Petition to Confirm Arbitration Award and to Enter Judgment [Dkt. #1] is GRANTED and respondent's Motion to Stay Action or, in the Alternative, Dismiss Petition [Dkt. #15] is DENIED. An appropriate order shall accompany this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[32] The "prime rate" is the "'the rate that banks charge for short-term unsecured loans to credit-worthy customers,'" *id.* at *8 (quoting *Oldham v. Korean Air Lines Co., Ltd.*, 127 F.3d 43, 54 (D.C. Cir. 1997)). Although the Final Award sets its own pre-award interest rate, BSDL "offers absolutely no authority, nor any reasoning, to explain why the interest rate used by an arbitral panel for pre-award interest should be mimicked by a United States district court when granting post-award, prejudgment interest." *See id.* at *9.